RICHMAN COLES, administrator of Daniel Linch, deceased, appellant,

*v.*

CHARLES L. VANNEMAN, respondent.

Although the mental infirmities of complainant's intestate were such as to throw upon defendant the burden of proving that his dealings with him in procuring the surrender of a mortgage, with a receipt in full endorsed thereon, were fair and honest, yet, where the family of such intestate, well knowing his mental aberrations, being acquainted with his transaction with defendant, and seeing his subsequent dissatisfaction therewith, take no steps to procure redress until after his death, which occurred eight years after the surrender of the mortgage, they are guilty of inexcusable laches.

On appeal from a decree advised by Vice-Chancellor Bird, who filed the following opinion :

Daniel Linch, being the owner of two hundred and fifty-two acres of land, sold it to his sons, Helms and Samuel, for $16,380, in January, 1866. They paid therefor by giving two mortgages, one for $5,000 and one for $11,380. March 15th, 1866, Daniel Linch assigned the $5,000 to the defendant, C. L. Vanneman, who further assigned it in the year 1876. March 6th, 1869, Samuel Linch conveyed his interest to Helms Linch in the said premises, subject to the said $5,000 and so much as remained due upon the $11,380 mortgage.

At the period last named the defendant, Charles L. Vanneman, who was brother-in-law to Daniel Linch, advanced to and for the said Helms Linch $4,730 and took his bond and mortgage upon the said premises therefor, in which his wife joined. But the defendant alleges that he actually paid this money to the said Daniel Linch on account of the bond, which he understood to be the only security which the said Daniel held for the $11,380, not knowing that he also held a mortgage for that sum. A few days thereafter he advanced $1,000 more to the said Helms for the like purpose and took his promissory note therefor; this, too, he alleges he paid directly to Daniel Linch; and at about the same time, at the request of the said Helms, he paid to the said Daniel the further sum of $455, for which he took the promissory note of Helms.

March 8th, 1875, Daniel Linch, being the owner of another tract of land, gave a mortgage thereon to the said Charles L. Vanneman to secure the payment of a bond for $4,050, so much money then loaned to the said Daniel Linch.

August 27th, 1877, Helms Linch and wife conveyed the said two hundred and fifty-two acres to the said Charles L. Vanneman and Helms Vanneman, in which conveyance it is declared to be subject to the said mortgage of $5,000, no reference whatever being made to the $11,380 mortgage.

On the 27th day of August, 1877, the said Charles L. Vanneman called at the house of the said Daniel Linch, and after a protracted interview with him, a part if not all of which was had in the presence of his wife and three of his children, he procured from the said Daniel the surrender of the $11,380

Coles *v.* Vanneman.

mortgage, with a receipt written thereon in full discharge thereof. The said Charles held said mortgage until the 19th day of October, then next, when he procured its cancellation. Daniel died on the 8th day of August, 1885.

The allegations in the bill are that the said $11,380 was never paid in full, and that the said Daniel Linch, the mortgagee, at the time he surrendered it, was of unsound mind and incapable of managing his affairs, and that the mortgage was obtained from him by unfair means and by taking advantage of his mental infirmities.

In my judgment two questions arise for consideration—(1) Was the mortgage paid in full at the time of its surrender? (2) If there be serious doubt whether it was paid or not then is the complainant chargeable with laches? (1) The payments, it will be observed, are alleged to have been made by the said Charles L. Vanneman by advancing $4,730 on the 6th of March, 1869, for which he took a mortgage on the same premises from Helms, and on the 20th of the same month $1,000, for which he took the promissory note of Helms, and about the same time $455, for which he also took the promissory note of Helms, all of which sums he alleges were paid by Daniel Linch. These payments are all denied by the complainant. On the 27th day of August, 1877, there was a payment of the whole amount due upon the mortgage which the said Charles L. Vanneman held against the said Daniel Linch, the principal of which was $4,050 and the interest which had accrued. That this payment was made is not disputed. We must, therefore, endeavor to ascertain whether or not the three sums of $4,730 and $1,000 and $455 were paid to Daniel Linch in March, 1869. It is very important to observe that this transaction took place at the office and in the presence of a scrivener—Mr. Coley—who has since died, at which place Daniel Linch was in attendance. Helms V. Linch must have been in attendance, for he executed a bond and mortgage to Charles L. Vanneman, but I feel obliged to say that his testimony appears to me to be so uncertain, so contradictory and so inconsistent with the position he occupied that I am unwilling to base any judgment upon it that looks

towards a settlement of the rights of these parties by judicial decree. A paper is produced by the defendant on which are written what purports to be two receipts by Daniel Linch, one for the $4,730 and one for the $1,000, with the name of Daniel Linch written under each, which is shown to the witness Helms and which he admits to be in his own handwriting, but which he also admits having said he wrote at the dictation of his father. His statements respecting the genuineness of these receipts are so trifling, so vague and so devoid of sense or meaning that I am unwilling to trust him as a witness, and must consider the case as though he had not testified.

If these payments were made at all they were made in March, 1869. Notwithstanding Daniel Linch and Charles L. Vanneman were brothers-in-law, and were on friendly if not on intimate terms, nothing has appeared to show that from 1869 to 1877 there was ever a word passed between them respecting this $11,380 mortgage or the alleged payments thereon. If Daniel were still living, so that he and Charles could tell their stories, it then might be shown that there was no occasion for any surprise at the absence of interviews between them on this subject. But Daniel being dead he cannot speak; and this being so, the statute prohibits Charles from speaking.

But in August, 1877, they had an interview upon the subject of the $11,380 mortgage, which we have a right to infer from the fact that it was then surrendered by Daniel after he had signed an endorsement thereon acknowledging the payment. However, what took place then, beyond such endorsement and surrender, we do not know, for Charles only surviving he cannot speak. Ordinarily the fair inference would be that the mortgage was paid and satisfied, for, had it not been so, Daniel would not have surrendered it.

The complainant contends that all that was then paid upon the mortgage was the amount due upon the $4,050 mortgage which Daniel had given to Charles in 1873, and that Charles, by taking advantage of the mental infirmities and weaknesses of Daniel, had prevailed upon him to endorse said mortgage as paid and then to surrender it for cancellation. As to this in-

Coles *v.* Vanneman.

firmity, suffice it to say, that many years previous to this Daniel had been in the asylum for several months, and that after his discharge therefrom much of his conduct was very peculiar. He would endeavor to secrete or hide himself from his friends at times; he would take books and go into the woods, or go without books and remain there alone for a day and sometimes for a longer period of time; sometimes returning to his home for meals and sometimes not. It is most evident that his mind was not well balanced and that he had so little thought or care about his property that he almost absolutely neglected it. Though this be emphatically so, he was allowed to have his own way, the members of his family never interfering with him, but I think frequently consulted with him as to the conduct or management of their affairs. Two of his sons managed his farm chiefly according to their own judgment.

There is nothing to show that his infirmities were of such a nature as to destroy his ability to determine values or to make just comparisons. Nor is there any proof or claim that he was ever imposed upon or wronged in any other transaction than the one under consideration.

I have said that he almost absolutely neglected his affairs, trusting to his sons; yet, not always so, for in 1873 he borrowed of his brother-in-law, the said Charles Vanneman, $4,050, and gave his bond and mortgage on his farm to secure the payment thereof. It should also be borne in mind that he executed the deed passing the title for this two hundred and fifty-two acre tract of land in 1866.

My mind inclines to the conviction that Daniel Linch's mental infirmities were of such a nature as to cast the burden of showing this transaction to have been fair and honest upon Charles L. Vanneman, notwithstanding he procured the surrender of the mortgage with a receipt in full endorsed thereon, were it not for other mitigating and controlling circumstances which the law regards as laches and which may most justly be presented as a defence. As intimated, Charles and his brother took the title to this land from Helms Linch on the 27th of August, 1877. On that day Charles called at the home of his brother-in-law

Daniel, when Daniel, his wife, daughter and three of his sons were at home, and all of them in and about the house a large portion of the time, and three of them all of the time. I think it cannot be successfully disputed but that they well understood the object Charles had in view. He was there in conference with Helms about this matter from one to three hours. Every circumstance or condition at the time and for days after was calculated to excite or quicken them to activity, in case there had been any evidence of wrong or unfair dealing. The conduct and declarations of Daniel were allowed to be detailed by the witnesses, his wife and children, not for the purpose of binding Charles, because he was not present, nor as part of the *res gestœ*, necessarily, but for the purpose of showing the mental condition of Daniel so immediately thereafter as to afford some aid in reaching a reasonable judgment as to the extent of his mental weakness, and also for the purpose of showing how the members of his family who controlled his business affairs were influenced by what he then said and did. Almost immediately after Charles left with the mortgage Daniel went to bed without in any manner undressing himself and remained in bed for two or three days. He seemed to be in great distress and expressed great anxiety respecting the transaction with Charles, saying in effect he was afraid he would never pay him. These things his wife and children all knew. They took place August 27th, 1877. Daniel lived until August 8th, 1885, eight years less nineteen days. During all this time, until nearly the last, there was but little if any change or decline in his mental spirits or vigor. He attended to and looked after his own affairs with about the same indifference that he had done for years before. He continued to reside at his home with his wife and children, enjoying all the attention and solicitude which they could bestow.

It is plain, and the court must conclude, that Daniel must have become reasonably well satisfied with the surrender of the mortgage, for if he had not during these eight years, he would have taken some steps to redress any supposed injury. And it seems to me that this same observation must be made with still greater emphasis, so far as his wife, and especially his children,

---

Coles *v.* Vanneman.

---

are concerned.    They knew all about the aberrations of his mind, and had for a long time previous to the surrender of the mortgage.    They had been attending to almost every business transaction in his behalf.    They were present at the surrender of the mortgage.    Although they knew what was going on, and knew the mental weaknesses with which he was afflicted, and saw the agitation of his mind, and saw the apparent prostration of his body after the surrender, they neither interfered to prevent the surrender or to inquire into the details of the transaction, nor did they take any steps to see that it was correctly conducted, or to prevent the husband or father from being imposed upon; nor did they afterwards become alarmed and so awakened as to attempt any redress.    From that time until the 19th of October, when Charles presented the mortgage for cancellation, one and all remained silent; and this silence continued from thence until some time after the death of Daniel in 1885.    No excuse whatsoever is offered for this delay.    If an unbroken silence can ever be invoked to show an acquiescence, it seems to me this may be.    Equity exacts diligence; it never tolerates a suitor in promoting his own profit by such procrastination.    In this case not only is Coley, the scrivener, dead, but Daniel Linch also.    Had proceedings been taken within a reasonable time after the surrender of the mortgage, not only would Daniel Linch have been permitted to speak as a witness, but Charles L. Vanneman also.    This delay of about eight years amounts to inexcusable laches.    *Doughty* v. *Doughty, 2 Stock. 347; Shipman* v. *Cook, 1 C. E. Gr. 251; Cooper* v. *Carlisle, 2 C. E. Gr. 525; Poulson* v. *Van Industein, 1 Stew. Eq. 306; S. C., 2 Stew. Eq. 594; Hance* v. *Conover, 4 Stew. Eq. 505; Brown* v. *Mutual Insurance Co., 5 Stew. Eq. 809; Wood* v. *Chetwood, 6 Stew. Eq. 9; Creath's Administrator* v. *Sims, 5 How. 192; Brown* v. *Buena Vista, 5 Otto 159; Lupton* v. *Janney, 13 Pet. 381; West* v. *Randall, 2 Mason 181; Maxwell* v. *Kennedy, 8 How. 210; Elmendorf* v. *Taylor, 10 Wheat. 152; Godden* v. *Kimmell, 9 Otto 201; Sullivan* v. *Portland R. R. Co., 4 Otto 807; Wilkinson* v. *Sherman, 18 Stew. Eq. 413.*

I think the bill should be dismissed, with costs.

Dandy v. Methodist Society of Ireland.

*Mr. David J. Pancoast,* for the appellant.

*Mr. John W. Wescott,* for the respondent.

PER CURIAM.

Decree affirmed, for the reasons given in the court of chancery.

*For affirmance*—THE CHIEF-JUSTICE, DEPUE, DIXON, GARRISON, LIPPINCOTT, MAGIE, REED, VAN SYCKEL, BOGERT, BROWN, CLEMENT, SMITH—12.

*For reversal*—None.